***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in the Pre-Trial Agreement as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Hartford Insurance Company was defendant-carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury on 9 June 1997, as a result of which defendants filed an I.C. Form 60 Employer's Admission of Employee's Right to Compensation. Plaintiff has received medical and indemnity benefits pursuant to the Form 60 since the date of the accident.
5. Plaintiff's average weekly wage was $341.67, which yields a compensation rate of $227.79 per week, based upon the Form 22 Wage Chart.
6. The parties stipulated the following documentary evidence:
 a. Plaintiff's Exhibit 6 — Plaintiff's Answers to Interrogatories, dated 8 June 2001;
b. Medical and vocational records, 466 pages,
c. Carrier file records on assistive devices, 26 pages,
 d. Medical journal of Bettylou DeMarco to defendant-carrier, 5 pages,
e. Carrier Notes, 173 pages, and
f. Pleadings, correspondence, and Orders.
8. Judicial Notice is taken of the following documents from the Commission file:
 a. Plaintiff's Motion, Defendants' Response, and the Administrative Order of Special Deputy Commissioner Matthew D. Harbin, filed on 16 November 2001,
 b. Defendants' Form 24, Plaintiff's Response, and the Administrative Order of Special Deputy Commissioner Myra L. Griffin, filed on 27 December 2001, and
c. I.C. Forms 33, 33R, 19, 62, 60, 22 (two forms).
 ***********
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 54 year old tenth grade educated female, who lives in Harmony, North Carolina. She suffers from several medical conditions, which were not caused by or causally related to the compensable injury, including: hypothyroidism, shortness of breath and heart problems.
2. In 1995, defendant-employer hired plaintiff as a doffer. Her duties included doffing and packing rolls of fiber in plastic packages. The rolls of padding were manufactured for automotive and other uses.
3. Since 22 January 1997, plaintiff has sought treatment from her family doctor, Dr. Daniel Bellingham of Piedmont HealthCare in Statesville, for fatigue and left arm superficial thrombophlebitis symptoms, following a 21 December 1996 non work-related intravenous treatment. Dr. Bellingham made a provisional diagnosis of left arm reflex sympathetic dystrophy and referred plaintiff to a pain center for treatment in February 1997. She was also diagnosed with possible arthritis in the left third finger.
4. Plaintiff sustained an admittedly compensable injury on 9 June 1997. As plaintiff was assisting the movement of fibers from the lapper machine to the grafting roller machine, the fibers wrapped around a guiding tube being held by plaintiff. The edge of plaintiff's tube was caught by the rollers of the grafting roller machine and plaintiff's right arm was pulled into the machine. Plaintiff's right hand and arm nearly to her elbow were crushed between the rollers.
5. Plaintiff was rushed to the emergency room of Iredell Memorial Hospital and Dr. Jeffrey Kuhlman performed an open carpal tunnel release, forearm fasciotomy, and decompressive fasciotomy of the dorsal compartments of the right hand. Dr. Kuhlman debrided the right hand and closed the wound on 12 June 1997.
6. From 1997 to 2001, defendant-carrier assigned nurse case manager, Tammy Smith, to consult on plaintiff's claim. Ms. Smith primarily provided telephone case management, managing plaintiff's medical treatment and authorizing expenditures for treatment, housekeeping and transportation services. In September 1998, Ms. Smith contacted the Industrial Commission to request assistance from its Nurse Consultants. Commission Nurse Bettylou DeMarco was subsequently assigned to plaintiff's case, working with Ms. Smith to coordinate plaintiff's medical needs. Ms. Smith worked to arrange the Harmony Pharmacy account, the assessment for assistive devices, and she conferred with Ms. DeMarco. Ms. DeMarco accompanied plaintiff to her physician appointments and assisted plaintiff in obtaining approval from defendant-carrier for devices to assist her in every day living.
7. Following treatment with Dr. Kuhlman, plaintiff requested a second opinion with Dr. Lois Osier, which defendants authorized. On 7 August 1997, Dr. Osier, a board certified orthopedic surgeon and hand specialist with Charlotte Orthopedic Specialists, examined plaintiff. She found plaintiff to have a significant amount of atrophy in the right hand and wrist muscles following the right hand and forearm crush injury. Dr. Osier opined that plaintiff was exhibiting symptoms of reflex sympathetic dystrophy (hereinafter called complex regional pain syndrome or CRPS); however, because it was difficult to determine which of plaintiff's symptoms was due to the crush injury and which might be the result of CRPS, Dr. Osier referred plaintiff to Dr. Gerald Aronoff of the Mid-Atlantic Pain Center for further evaluation regarding that condition. Dr. Osier continued to treat plaintiff for her right hand and forearm injuries.
9. On 8 August 1997, plaintiff presented to Dr. Aronoff with symptoms of constant burning and sharp pain from all right-hand fingertips to the palm, the wrist and distal forearm. Plaintiff also complained of insomnia and severe depression. Dr. Aronoff opined that plaintiff's symptoms were consistent with CRPS 1-active, and recommended a change in plaintiff's medications to OxyContin.
10. Dr. Aronoff continued to treat plaintiff with varying levels of medication and a series of pain blocks provided by Anesthesia Pain Service. Plaintiff also continued to be treated by Dr. Osier. On 25 November 1997, Dr. Osier released plaintiff to attempt to return to work as of 1 December 1997, with no use of the right hand. Plaintiff returned to work in December 1997 in a position which was supervisory and required only the use of a tape measurer with the assistance of another worker. However, after four hours she experienced a flare-up of her CRPS and swelling in her right hand. Dr. Osier took plaintiff back out of work, and on 31 December 1997, performed a capsulectomy of plaintiff's right index and long PIP joints and opened plaintiff's right carpal tunnel for a radical synovectomy of the flexor tendons.
11. Following the capsulectomy, plaintiff suffered a re-flare of CRPS and continued treatment with both Drs. Osier and Aronoff. On 28 May 1998, Dr. Osier addressed for the first time that plaintiff may be unable to return to factory work. Dr. Osier opined that plaintiff might be able to attempt office work in the following months.
12. On 6 July 1998, Dr. Osier reports plaintiff's first complaints of pain in her right shoulder. Dr. Osier diagnosed plaintiff with CRPS of the shoulder with possible subacromial bursitis. On 1 October 1998, Dr. Osier reports plaintiff's first complaints of CRPS in her left upper extremity, some discoloration of the left hand and increased swan-neck deformities of the left index and long fingers. By December 1998, Dr. Aronoff suggested that plaintiff receive assistance from a home health aide to do housework.
13. Defendant-carrier initially authorized taxi services for plaintiff's transportation to medical appointments and also for weekly trips to the grocery store, after Dr. Aronoff restricted plaintiff to no driving in late 1998. Beginning in February 1999, Coachman Limousine Service was authorized to provide transportation because it was more reliable and less expensive than the taxi service.
14. Drs. Osier and Aronoff continued to treat plaintiff through 1999. Plaintiff's bilateral CRPS was treated with injections and medication, but plaintiff continued to experience flare-ups in both hands and shoulders. By the end of 1999, Dr. Osier believed plaintiff had no further surgical needs for the right upper extremity and referred further treatment for plaintiff's CRPS to Dr. Aronoff.
15. After plaintiff informed Ms. Smith she wanted a local doctor to manage her medications (30-day controlled substances), defendant-carrier authorized plaintiff to go to Dr. Bellingham to perform pharmacological management and related lab work. Dr. Bellingham was not authorized to provide treatment. The Full Commission finds that managing medications reasonably required some treatment; therefore, the treatment by Dr. Bellingham for right upper extremity problems was reasonably required during the period he managed plaintiff's medications and lab work.
16. On 10 December 1999, Dr. Bellingham saw plaintiff for right CRPS, for which he prescribed Davrocet. On 27 December 1999, Dr. Bellingham referred plaintiff for an endocrinology work-up to evaluate thyroid function and a thyroid nodule.
17. In December 1999, Sherri Burnaby was assigned as defendant-carrier's claims representative for plaintiff's file, replacing Ms. Smith.
18. On 7 February 2000, Dr. Osier found plaintiff had reached maximum medical improvement from an orthopedic perspective and retained a 58% permanent partial impairment to her right hand as a result of the compensable injury. As of 7 February 2000, Dr. Osier found plaintiff capable of returning to work with restrictions of no lifting, pushing or pulling over one pound with both hands, no prolonged reaching overhead or extreme positions of the neck, no production work, no use of vibratory tools, no repetitive gripping, and no extreme temperatures. Light clerical work with the left hand was recommended.
19. Plaintiff submitted I.C. Form 25T's to Ms. Burnaby in 2001 which reflected travel for treatment by Dr. Bellingham. However, no medical notes had been submitted. On or about 26 May 2001, Ms. Burnaby requested medical records from Dr. Bellingham's office. It was not until the fall of 2001 that complete records were provided, after which defendant-carrier notified plaintiff's counsel that plaintiff would no longer be authorized to go to Dr. Bellingham for pharmocological management, as they had been billing defendant-carrier for treatment which was for medical conditions unrelated to the compensable accident. Defendants are liable for treatment provided by Dr. Bellingham for right extremity problems while managing her medication.
20. On 3 March 2000, Dr. Aronoff wrote a note in which he suggested that plaintiff's 58% impairment rating to her right hand be increased by 5% for plaintiff's chronic pain in that extremity. He concurred with Dr. Osier that plaintiff required four hours of housekeeping assistance per week for an indefinite period of time, and noted that while plaintiff had some difficulty driving, he opined that from an independence standpoint it was important that she continue the attempt to do so.
21. After Dr. Osier restricted plaintiff to no use of vibrating items, such as vacuum cleaners, defendant-carrier authorized weekly housekeeping services through Merry Maids, from November or December 1998. After Merry Maids closed, plaintiff requested that Wanda Sue Waters be hired to provide the weekly housekeeping duties. Defendants paid for services by Ms. Waters through July 2001. However, payment for these services was terminated after defendant-carrier conducted surveillance and believed they had been billed for services which had not been performed on 6 August 2001. No arrangements for housekeeping services have been provided since that time.
22. On 25 July 2001, Paul Howerton of defendant-carrier retained the services of vocational rehabilitation case manager David Morgan of National Health Care Resources to assist with plaintiff's case. After contacting plaintiff's attorney, Mr. Morgan met with plaintiff and her attorney on 13 September 2001. Based upon the medical restrictions and his interview with plaintiff, Mr. Morgan wrote to Dr. Aronoff for clarification on driving restrictions, prior to preparing an action plan.
23. Although Dr. Bellingham had previously given plaintiff a five-mile driving limit, Dr. Aronoff discussed the issue with Dr. Bellingham and they agreed plaintiff was capable of driving ten miles one-way. Dr. Osier deferred to Dr. Aronoff on this issue.
24. Plaintiff has been unable to drive to Charlotte on her own for medical and therapy sessions since the compensable injury. Transportation services were pre-authorized by defendant-carrier on a per-trip basis. Ms. Smith would normally contact Joan Martin at Coachman Limousine a week in advance of appointments in order to schedule necessary travel.
25. Although initially defendant-carrier arranged for plaintiff's trips with Coachman, plaintiff began calling them directly to schedule services. By September 2001, the frequency of plaintiff's trips had increased and the billing reflected trips to doctors who were unknown to defendant-carrier, and hence unauthorized.
26. Ms. Burnaby contacted Joan Martin of Coachman for a clarification as to the transportation services for which defendant-carrier was being billed at some point in November of 2001. Based upon evidence presented at the hearing before the Deputy Commissioner, in at least half of Coachman's billed transportation services during this time, plaintiff and the driver would stop to have a meal, even in local travel. As the transportation services were billed on an hourly basis, the limousine service charged defendant-carrier for this time. Defendant-carrier denied payment for unauthorized trips after these problems were discovered.
27. Plaintiff also submitted claims for transportation for ultrasounds, MRI's, a couple's counselor and trips to Dr. Alford, Dr. Jorgenson, Dr. Faulk and Dr. Cassidy. These were all either unauthorized treatment or not related to the compensable injury. Therefore, defendant-carrier reduced the amounts of claimed transportation services by deducting the unauthorized travel.
28. Due to a miscommunication or a misunderstanding of the conversation, Ms. Martin left Ms. Burnaby with the understanding that Ms. DeMarco had dinner with plaintiff and the Coachman driver. Thereafter, defendants' counsel wrote to Commission Chairman Lattimore, requesting that Nurse DeMarco be removed from the file due to her friendship with plaintiff.
29. Contrary to defendants' contention, Ms. DeMarco never had a meal with plaintiff. The competent evidence in the record supports a finding that Ms. DeMarco's relationship with plaintiff was unbiased in nature and consistent with the requirements of a certified case manager.
30. Defendant-carrier received bills from Harmony Pharmacy which were returned after a medical bill examiner was unable to correlate the bills with authorized treatment. An explanation of benefit form was sent to the Pharmacy for 4 September 2001 through 29 September 2001, and thereafter, pharmacy manager Sherry Hager called Ms. Burnaby regarding the unpaid pharmacy bill. As of the date of the second hearing before the Deputy Commissioner, there was an outstanding balance with Harmony Pharmacy of $l,429.00.
31. Ms. Hager handwrites plaintiff's name and identifiers on the bills submitted to defendant-carrier. However, Ms. Hager was unaware of which physicians or medications were authorized by defendant-carrier. For example, a number of items from Dr. Bellingham, including a Pollenex Whirlpool, were billed to defendant-carrier, even though unauthorized.
32. On 31 October 2001, plaintiff filed a Motion for Appropriate Medical Treatment with the Commission, in which she requested payment of transportation, prescription drugs, and housekeeping services. Defendants filed a Response, opposing plaintiff's Motion. Special Deputy Commissioner Harbin filed an Order of 16 November 2001 which provided as follows, " plaintiff's motion for ongoing medical treatment is Denied except to the extent that defendants have consented to provision for certain requests presented in the motion. Accordingly, there is no need to enter an Order with respect to the payment of transportation services to and from medical visits or payment of prescription drugs. Furthermore, pursuant to this Order defendants may choose the transportation provider."
33. Plaintiff did not file a Motion to Reconsider or to appeal Special Deputy Harbin's Order. Defendants ceased paying for travel they did not authorize.
34. Defendants have arranged for transportation services to be provided for plaintiff through another service provider due to the problems encountered with Coachman.
35. Prior to October 2001, Dr. Osier and Dr. Aronoff reviewed the job description for the quality control assistant position and found the job duties consistent with plaintiff's restrictions. After plaintiff's doctors approved the job, defendants offered plaintiff the quality control assistant job.
36. On 3 October 2001 during the appointment with Dr. Aronoff, plaintiff informed Mr. Morgan that they were going to see if she was still physically capable of performing the quality control assistant job. On or about 8 October 2001, plaintiff's attorney contacted Mr. Morgan to request that he attend the return-to-work effort to serve as the job coach. The job description indicated that 20% of the job was office work and 75% was in the plant.
37. The tasks which make up the quality control assistant job have been in existence at the plant for a number of years prior to plaintiff's injury; however, the job has not been performed by one person, but instead has been performed as parts of other jobs in the plant. The record shows that no one has ever held the position, either before or after it was offered to plaintiff. Accordingly, the job of quality control assistant constitutes make work and is not suitable employment indicative of plaintiff's capacity to earn wages.
38. On 11 October 2001, plaintiff presented at the plant to attempt to return to work. However, plaintiff was very groggy, as the doctor had increased her medications. Mr. Morgan noted the doctor at the previous day's appointment had given plaintiff a duragesic patch, which is an epidural skin patch containing fentanyl. Mr. Morgan incorrectly surmised that the patch was morphine based.
39. Mike McAllister took plaintiff and Mr. Morgan into the plant to show plaintiff how to do the paperwork for the job. Plaintiff worked sorting papers in an office for approximately 75 minutes. Mr. McAllister advised Mr. Morgan that they would not be taking plaintiff to perform the job in the plant because she should not be around dangerous machinery while she was groggy from medication.
40. Mr. Morgan called defendant-carrier and his supervisor to advise that plaintiff was not capable of performing the full duties of the job. After a conference call between Ms. Burnaby, Mr. Howerton, the defense attorney, Mr. McAllister, and Mr. Morgan, it was agreed that plaintiff would stop work for the day. Mr. Morgan was instructed to put his file on low-level monitoring status.
41. On 12 October 2001, defendants' counsel notified plaintiff by letter to plaintiff's counsel dated 11 October 2001, that "your client returned to work this morning while under the influence of an impairing substance, specifically morphine. Under William T. Burnett, Inc.'s Company Policy Manual, it is considered a "major offense" to present for work while having present in the body any form of narcotic, unless the same is prescribed under the direction of a physician and does not impair job performance or threaten safety, health, security or property." The letter went on to state that plaintiff "has been instructed to return to work tomorrow sober and unimpaired. . . . Should [plaintiff] violate this policy tomorrow, she will be terminated and her behavior will be considered a constructive refusal of suitable employment and ultimately grounds to terminate her benefits."
42. Due to plaintiff's continuing need for medication which renders her unable to work around the dangerous machinery in plaintiff's plant, the job of quality control assistant was not suitable for plaintiff. Further, given plaintiff's continuing need for medication which was known to defendants, the letter from defendants' counsel constitutes the willful termination of plaintiff's employment for reasons related to her compensable injury by accident.
43. On 26 October 2001, defendants filed a Form 24 Application to Terminate Benefits on grounds that plaintiff refused suitable employment by reporting to work under the influence of a narcotic medication. Special Deputy Griffin filed an Order on 27 December 2001, referring the case for a formal hearing.
44. Margaret M. Houlihan, Ph.D., of Southeast Psychological Services has provided psychological evaluations and treatment for plaintiff from 27 February 2002 through 21 May 2002, on Dr. Aronoff's recommendation. Dr. Houlihan's treatment of plaintiff is directly related to depression suffered by plaintiff as a result of CRPS which evolved as a direct and natural consequence of her compensable injury by accident.
45. Since 5 March 2002, Leslie S. Austin, R.N., of Spectrum Case Management, Inc., has provided plaintiff's medical case management services.
46. On 18 April 2002, Ms. Austin sent plaintiff's work restrictions to Mike McAlister to determine whether defendant-employer had work suitable to these restrictions. The human resources department later provided a job description for the quality control assistant. However, on 22 April 2002, Ms. Austin sent a job analysis form for defendant-employer to complete, as the job description was too vague. All parties were advised of this communication.
47. By April of 2002, Dr. Aronoff found plaintiff's CRPS in partial remission. He further found plaintiff capable of beginning vocational planning for one-handed work and driving distances of 10 to 15 miles. He found no evidence of sedation or impairment of plaintiff's reaction times due to medications; however, her medications are subject to change with the occurrence of flare-ups of her CRPS. Dr. Aronoff further opined that it is more likely than not that plaintiff will continue to require varying dosages of analgesic medication.
48. After reviewing the records of Dr. Bellingham's treatment of plaintiff's left hand in 1997 prior to her injury, Dr. Aronoff opined that plaintiff's was not suffering from CRPS at that time and that Dr. Bellingham's provisional diagnosis of left arm reflex sympathetic dystrophy was incorrect. Dr. Aronoff also noted that "there are many people who will get CRPS in one extremity and it will stay in that extremity, and then there are some people, albeit a relatively small percentage, who will get it in the other extremity." He further noted that plaintiff's left hand condition "looked like early versions of what I saw in the right hand." There is insufficient evidence from which to find that plaintiff's left hand condition is causally related to or is a direct and natural result of her compensable right extremity CRPS.
49. On 24 April 2002, Dr. Osier reiterated that plaintiff had reached maximum medical improvement with respect to orthopedic treatment for her right hand. She recommended that plaintiff seek follow-up with Dr. Dunaway for her right shoulder complaints. Dr. Osier reiterated plaintiff's 2000 restrictions of no repetitive gripping, pushing or pulling; no prolonged reaching overhead or extreme positions of the neck; no exposure to vibratory tools with either hand; no extreme temperatures; one-pound lifting restrictions; right hand use only as assist; and light clerical work with the left hand.
50. On or about 22 May 2002, Mr. Howerton contacted Mr. Morgan to arrange for plaintiff to return to work in the quality control assistant job. Mr. Morgan contacted plaintiff's counsel, who indicated that plaintiff would defer action on this until the litigation was completed. Plaintiff's presentation of evidence before the Deputy Commissioner ended on 8 May 2002. Therefore this issue was not properly considered by the Deputy Commissioner in her Opinion and Award. Further, while plaintiff is obligated to cooperate with Mr. Morgan and any other vocational rehabilitation counselors who may be assigned to assist her in return to work efforts, the quality control assistant position has been determined unsuitable for plaintiff and a make-work position. Therefore, plaintiff's refusal to accept this position was justified.
51. Plaintiff's hyperthyroidism, thyroid nodule and thrombophlebitis are not causally related to the compensable injury or treatment of the compensable injury.
52. Although plaintiff lists as an issue for determination whether she is entitled to a physician of her own choosing, there is no evidence to suggest that plaintiff requires a change of treating physician.
53. Defendants defended this case on reasonable grounds.
54. Plaintiff does not require preparation of a life care plan to determine her future needs for transportation, housekeeping, attendant care or assistive devices. None of her treating physicians indicated that a life care plan is medically necessary.
55. There is no evidence that defendants denied treatment for medical and emotional conditions causally related to the compensable injury. Defendants' rescission of authorization for Dr. Bellingham to manage plaintiff's medication and lab work was justified after they were billed for treatment and for medications which were unauthorized.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The burden is on the employee to show that he or she is unable to earn the same wages that were earned prior to the injury. This may be shown one of four ways: (1) by producing medical evidence which supports the conclusion that the employee is incapable of work in any employment; (2) with evidence that the employee is capable of obtaining some employment but, after a reasonable effort has been unable to obtain employment; (3) with evidence that the employee is capable of some work but due to other factors such as age, education, inexperience, etc., seeking work would be futile; or (4) with evidence that the employee is employed at a wage less than that earned prior to the injury. Russell v.Lowes Prod. Distrib., 108 N.C. App. 762, 425 S.E.2d 454 (1993). In the instant case, plaintiff has shown that as a result of her physical restrictions due to right extremity CRPS as well as her other medical conditions, including depression and left extremity CRPS, she is medically incapable of obtaining employment at this time.
2. As a result of the compensable injury, plaintiff is entitled to temporary total disability compensation at the rate of $227.79 per week for the period from 9 June 1997 and continuing. N.C. Gen. Stat. §97-29. Plaintiff did not constructively or willfully refuse suitable employment in October 2001 when she attempted to return to work while using physician-prescribed medication. Plaintiff's refusal to accept the quality control assistant position offered by defendants in April 2002 until the Industrial Commission determined the suitability of the job was justified under the circumstances of this case. N.C. Gen. Stat. §97-32.
3. Dr. Houlihan's treatment of plaintiff is directly related to depression suffered by plaintiff as a result of CRPS which evolved as a direct and natural consequence of her compensable injury by accident and as such constitutes a part of plaintiff's compensable treatment under the Act. N.C. Gen. Stat. § 97-25.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability, including psychological treatment for depression. N.C. Gen. Stat. § 97-2(19). Plaintiff is required to cooperate with all reasonable medical and vocational treatment and counseling which is being provided for her benefit by defendants.
5. Plaintiff is entitled to have defendants provide transportation for all treatment and obtaining prescription medication related to her compensable injury by accident when such travel entails driving more than 15 miles in one direction. N.C. Gen. Stat. § 97-25.
6. Plaintiff is entitled to have defendants pay for four hours per week of housekeeping services. N.C. Gen. Stat. § 97-25.
7. In accordance with Commission Rule 703(1), plaintiff's failure to file a Motion for Reconsideration or an appeal of the 1 November 2001 Administrative Order of Special Deputy Harbin does not serve as a bar to plaintiff raising the transportation and housekeeping issues. The Rule specifies, "These issues may also be raised and determined at a subsequent hearing."
8. Pursuant to N.C. Gen. Stat. § 97-25, an injured employee may select a physician of (her) own choosing to attend, prescribe and assume the care and charge of (her) case, subject to the approval of the Industrial Commission. In the event plaintiff seeks to change her treating physician, she must make the request for approval of the Commission within a reasonable time and there must be competent evidence that the treatment was required to provide relief, effect a cure or lessen her period of disability. Schofield v. Great Atlantic and PacificTea Co., 299 N.C. 582, 264 S.E.2d 56 (1980).
9. Defendants are obligated to pay Dr. Bellingham for all treatment for her right extremity CRPS while he was authorized to manage plaintiff's medications from December 1999 until Fall 2001 when he was no longer authorized. N.C. Gen. Stat. § 97-25.
10. Plaintiff is not entitled to have defendants pay her reasonable attorney's fees under the provisions of N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay temporary total disability compensation to plaintiff from 9 June 1997 and continuing at the rate of $227.79 per week. Defendants shall be entitled to a credit for those sums already paid to plaintiff.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to counsel. Thereafter, plaintiff's counsel shall receive every fourth check.
3. Defendants shall pay all reasonable and necessary medical expenses incurred for treatment, which is causally related to plaintiff's compensable injury, including psychological treatment for depression, after said expenses have been approved by the Industrial Commission. However, defendants are not obligated to provide transportation services unless the authorized medical services are located more than 15 miles from plaintiff's residence.
4. Defendants shall pay the costs.
 ***********
It is further ORDERED that
1. Although Commission Nurse Consultant Bettylou DeMarco provided competent and professional medical case management to plaintiff, she is relieved of further responsibility in this case. Defendants shall provide all reasonably required vocational services and medical case management to plaintiff.
2. Plaintiff is hereby ordered to cooperate fully with vocational and medical treatment and counseling provided for her benefit.
3. Defendants shall provide four hours per week of housekeeping services to plaintiff until further Order of the Commission.
4. Defendants are ordered to pay Dr. Bellingham for all treatment for her right extremity CRPS while he was authorized to manage plaintiff's medications from December 1999 until Fall 2001 when he was no longer authorized. If the parties cannot agree on the amount of payment to Dr. Bellingham, they shall submit a Form 33 Request for Hearing on the matter.
This the ___ day of September, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER